Here he, here he, here he. The United States Court of Appeals for the 11th Circuit is now open according to law by the state of the United States and the Congress of Florida. Please be seated. Good afternoon. This is Tony Barksdale v. the State of Alabama. Stephen Mark Schneebaum is here for Barksdale. Robert Overing is here for the State of Alabama. And Mr. Schneebaum, you may begin. Well, thank you and good afternoon, Your Honor. May it please the Court. Tony Barksdale was sentenced to death in Tallapoosa County Circuit Court, Alabama, on January 14, 1997. He did not receive assistance of counsel in the sentencing phase of his trial. His defense counsel conducted next to no investigation, made no effective presentation of available mitigators, including in particular an abusive and dysfunctional childhood. And he said not a word to address the aggravating circumstances relied upon by the state to obtain the sentence of death. Now, we understand that the burden placed on the petitioner in a case like this by the Anti-Terrorism and Effective Death Penalty Act is a heavy one. And we understand that my task today is to persuade the court both that defense counsel did not carry out his duties in conformance with professional standards, but that his failure to do so caused prejudice and that the state courts simply got it egregiously wrong. Now, the inadequacy of counsel's investigation and presentation of possible mitigating evidence are stark and irrefutable. And they led to prejudice. The state court's decisions to the contrary were unreasonable on the facts and inconsistent with Supreme Court precedent, as I shall now show. There was an evidentiary hearing on the Rule 32 motion in the state court. And I think the record reflects that Mr. Grogan, his attorney, said he had obtained some information during his investigation of the mitigation phase of the case. But his parents were not very cooperative. His mom didn't even attend the trial. And there were certain risks involved in presenting their testimony as well. But he obtained some information, and his dad might reveal his drug sales and his gang activity. So it's hard to see if that was a reason. It's hard to support your argument that counsel was deficient with regard to at least the first prong of the Strickland v. Washington test based on that information. Well, let me address that, if I may, Judge Wilson. As this court is well aware, having addressed this matter many times, for an investigation to be limited at the stage of penalty in a capital case, there must be a reasonable basis for doing that. Here it is correct, as Your Honor said, that there was some conversation between counsel and his client, as one would expect there would be. But not one single bit of information that came out of those conversations was introduced by way of mitigation. With respect to the parents, the time records of Mr. Goggins, which he testified were correct and which he signed under oath, those time records demonstrated that the totality of his contact with Tony Barksdale's mother was three phone calls of six minutes each, no more than six minutes. But during that conversation that he had with the mother, she was very clear that Tony got himself into trouble and he has got to get himself out. I mean, it was very clear and he thought that it was a risky decision to put her on the stand. Why is that not a strategic decision by counsel? It may have been a strategic decision, Your Honor, not to put her on the stand, but it was not a strategic decision not to ask more questions. He was on the phone with her for a total of no more than 18 minutes. That's all he did with her. He didn't, and in her Rule 32 testimony, she was asked, did Mr. Goggins ask you about Tony's family? No. Did he ask you about any abuse in the family? No. Did he ask you about drug abuse? No. Did he ask about discipline? No. None of those things came up. We know from Ms. Archie, Ms. Archie being Tony Marksdale's mother, we know from Ms. Archie's testimony that at least one of those conversations was focused not on anything potentially mitigating, but whether someone could send Tony Marksdale clothing to wear at his hearing. The total time invested in those conversations was 18 minutes, and the same was true of the father. So if we grant the benefit of the doubt to Mr. Goggins, the totality of his investigation of potential leads on mitigation was 36 minutes. The point you try to make in the brief, I think, from my reading of it is that he needed to do a heck of a lot more to investigate and unearth what was there, and that he failed to do that. That's absolutely right, Your Honor, indeed. And given the fact that the mother was difficult to communicate with, given that the father seemed very resistant to any kind of sympathy for his son, given the fact that Tony Marksdale didn't offer anything, we invoke the Supreme Court's decision in the Rompillot case, in which there was also a recalcitrant defendant, a difficult family that didn't want to share information. Here we're not suggesting there was any kind of conspiracy of silence or anything like that. We're simply saying these were troubled people, and they got calls, the two parents got calls from a lawyer they'd never met in a state they presumably had never been to, asking them in 18 minutes maximum to share very personal information. To ask Mrs. Archie, for example, whether she was a drug abuser, which in fact she was, as she testified at length at the Rule 32 hearing. The bottom line is this, Tommy Goggins gave the jury absolutely no information about Tony Marksdale. And when the Supreme Court in 1976 restored or reinstated the authority of states to impose the death penalty, it was very specific in why it did that. It said that the system of sentencing in any state that has the death penalty must permit, and I'm reading, focus on the particularized nature of the crime and the particularized characteristics of the individual defendant. Let's assume that you can get around prong one of Strickland. This was a cold-blooded killing of a 19-year-old young woman who pleaded for her life. So how do you get around the prejudice prong of Strickland in a case like this? We indicate to the court that there were, through the Rule 32 hearing, evidentiary hearing, the presentation of substantial evidence with respect to Tony Marksdale's background. And remember, at the end of the day, the job of the jury is to balance aggravators and mitigators. So we can't say, no, this killing wasn't brutal. We can't deny the facts and we don't deny the facts. But we do say that had mitigating evidence been presented to the jury, there is more than a reasonable chance that at least two members of that jury would have concluded that Tony Marksdale did not deserve to die at the hands of the state of Alabama. Now, we know I would cite three illustrations of that point, three illustrations of what the Rule 32 hearing elicited from Tony's mother in particular and from Lieutenant Colonel Maxwell Johnson. I'll come back to him in a moment. Again, the only mitigator that was presented to the jury was that Tony was 18. And even that mitigator wasn't anything in particular about him. The argument about age was simply 18-year-olds make bad decisions. The jury was presumably 18 at one time or another, and presumably they have views on whether 18-year-olds make bad decisions. But it wasn't that Tony Marksdale at age 18 was particularly disposed to make bad decisions because the jury knew nothing about that. So if he was able to uncover all of this mitigating evidence, didn't Mr. Grogan testify at the evidentiary hearing that he would not have presented it anyway because of the risks associated with putting the mother and the father on the stand? I mean the evidence would come out through their testimony, right? The mother and the father? The mitigating evidence that he didn't discover that you said he should have discovered? Well, it was not only the mother and father, Your Honor. It was also in the evidence of Maxwell Johnson that was presented at the Rule 32. So how do you get around that he made a strategic decision? A reasonable strategic decision not to open the door to potentially, you know, there's a double-edged sword associated with this. He was an experienced criminal lawyer. Grogan didn't win his first case. He was an experienced criminal lawyer. He made a strategic decision. 2025 capital cases? Not to go down that. The answer to that question, Your Honor, is there cannot have been a strategy, the essence of which, the totality of which, was to say to the jury, in effect, my client is 18 years old. You just convicted of a murder. Please don't kill him. That's it. There was nothing more. There was nothing about Tony Barksdale. There was nothing about his dysfunctional childhood that was elicited at the Rule 32 hearing. The testimony of the mother was powerful. The testimony with respect to two or maybe three things. First, her own drug addiction and dysfunction. Her inability to act as a mother. The fact that she was simply unable to care for her children. And like the mother of Terrence Andrus in the Supreme Court's case of several years ago, she was involved in prostitution. She was involved in selling drugs. She was high more often than not. And she didn't notice when her own sons disappeared. That's exactly what happened in the Andrus case. It's exactly what happened in the Barksdale case. And the jury did not know that. Could have known it, but they didn't know it. So that's one. Another thing they didn't know about was the father's violence. And the father's violence was the subject of some very emotional testimony during the Rule 32. Including the mother's description of a knife attack on her by her by then estranged husband. And an attempted rape with a broomstick that took place while Tony Barksdale was in the house and heard her screams. So again, I can't say with certainty that not a single juror would have found the aggravators to outweigh the mitigators. But that's not the test. There need only be a reasonable probability. The balancing act in this case provided the jury nothing with which to balance against what they discerned. So you don't forget the last thing on your list. What was number three? Number three was the fact that Tony Barksdale at age junior high school range 12 disappeared from his home. For quoting the Maxwell Johnson testimony for weeks or months. And he actually moved in, lived with Max Johnson, who was a retired Marine Lieutenant Colonel. Whose testimony the trial court dismissed without paying any credence to it. But he nevertheless testified that Tony lived with him. They went to church together. Made sure he went to school. Made sure he was dressed properly. All of those things. He lived with him for weeks. And the parents never looked for him. Never looked for him. A 13-year-old boy. 12-year-old boy disappearing from the home. And no one cared enough to find out where he was. Can you talk? I know we're going into prejudice. But can you talk about your argument that the attorney didn't do what he could have and should have done with regards to the prior conviction? Yes. With pleasure, Your Honor. Thank you. With respect to the prior conviction, Tony Marsdale, age 16, was involved in a robbery of a pizza delivery man in Alexandria, D.C. He was brought up in the Washington, D.C. area. And he and his brother and another boy held up a pizza delivery man called Oscar Cervantes and stole money and pizzas. Tony was charged, although age 16, charged as an adult and pleaded as an adult to guilt. Served about six or seven months in adult prison in Alexandria. But the aggravator under Alabama law for after conviction of capital murder is involvement in a crime of violence. Now, the jury, any time anyone is involved in a robbery, if that proves satisfactorily engagement in a crime of violence, then game set and case closed. But the law permits, again, mitigation to be presented. And in this case, the mitigation would have been that Tony Bartsdale was not armed. There is no evidence that he knew that anyone of the three of them was armed. But there wasn't. I mean, I mean, when Alabama gets up here, they're going to say that all the state did was to admit a certified copy of the judgment of conviction, period. So there was no evidence presented to the jury that he was armed. No, but in the closing argument, Ray Clark, the district attorney. Was there anything at the trial, anything in the record other than we admit the certified copy of the judgment and the evidence, period? Yes. He said the aggravator involves a prior conviction for a crime of violence and robbery is a crime of violence. That's what he said to the jury. Now, among us lawyers, as a matter of technical definition, yes, robbery is a crime of violence. But again, if that's all that's needed, then no mitigation would ever be even relevant. The mitigation should have been to say, yes, robbery is a crime of violence. And I don't plead that this was a proper thing to do. But Tony Bartsdale was not involved in violence. He wasn't armed. He didn't threaten violence. He didn't commit an act of violence. Help me with this, though. How does he put that evidence in? Well, one way would have been when Oscar Cervantes, the victim of the pizza robbery, was brought by the state to Alexandra City, Alabama, to testify. Tommy Goggins had never spoken with him. He did absolutely no research into what happened in Virginia. Maybe I misread the record, but I thought that Mr. Goggins testified that the reason he made a strategic decision to allow the record to come in of the prior conviction was he preferred that than to having a live witness testifying as to what happened. That may be the answer. I'm sure that's what he said because he had no idea what that live witness might say. That's my point. He had not... But, I mean, frankly, if you've done any kind of evidentiary hearing, you know that that's a really big risk if you're a defense counsel not to stipulate to a prior conviction instead of having a live witness testify as to the level of fear and other things that they felt when they were subjected to a crime of violence, correct? I mean, that really is an ultimate strategic decision, isn't it? Well, it could be, Your Honor, but in this case we submit it was not. A strategic decision requires planning, requires forethought. But this is an individual who did 20 or 25 capital cases. I mean, you could do one felony case and know that it's a big risk to call a victim of a crime onto the stand as opposed to stipulating to a prior conviction. I understand, Your Honor, but my point is that Tommy Goggins knew forever that the state was going to rely on that prior conviction. He didn't get the records. He didn't talk to the witnesses. He didn't talk to the defense counsel. He didn't talk to the social worker assigned to the case. He didn't do any of those things until he ran into Oscar Cervantes, the victim, in the back of the courtroom during the trial with the jury in the box. And at that point, they exchanged a few words, and all that Goggins could remember at the Rule 32 was, quote, he said that he recognized Tony from being there. Did he obtain the pre-sentence investigation report from the Alexandria court? Yes. He did not obtain anything from the Alexandria court. Your point is, as I take it, is not that he shouldn't have stipulated to the fact of the conviction. It's that he should have made an argument to mitigate against the existence of the conviction. Absolutely right, Your Honor. That is precisely our argument. And those two things, at least theoretically, are not impossible to do at the same time. Of course not. And, indeed, it has to be done at the same time if you are representing someone who has a prior conviction. You've got to be able, as defense counsel, to present some reason to the jury, something about the defendant, something about the crime, something about his upbringing, something. Did Barksdale testify? Did Barksdale testify at the trial? I'm sorry. Barksdale, did he testify at his trial? Did he testify? I'm sorry. Did he take the stand? Your client, your client, did your client testify at the trial? No, Barksdale did not testify at the hearing. In fact, defense at the guilt stage called two witnesses and cross-examined almost none of them. But I understand that we're not here to talk about the guilt stage. We're here to talk only about the penalty stage. Rompilla and many other cases, including precedents of this court, are quite clear that when the state makes it apparent that they're going to rely on a prior conviction as the aggravator, counsel has an absolute duty to get the records of that case, pick them apart, and see if there's any room for mitigation. He didn't do that. The first time he paid any attention to that prior conviction was in the courtroom with the witness, potential witness, already in the room ready to get on the stand. That's not as— So your argument is that there's a reasonable probability that the result would have been different had he done that. We submit that if the mitigating evidence that was presented at Rule 32 had been before a jury and the jury had known that the aggravator was not a slam dunk, there was a mitigation or a reduction or a dilution that was possible. We submit that there is more than a reasonable probability that the outcome would have been different. And again, after decisions of this court, most recently in the Marcus Williams case, we submit that that is the burden that we must carry. Okay. So on that point, let's assume that you are right on both prongs under traditional standards of appellate review. Why did the Alabama courts rule in a way that was contrary to or an unreasonable application of existing Supreme Court precedent at the time? Well, the Alabama courts' decisions, which I have to add in parentheses, none of which were written by the courts of Alabama. The circuit court decision was written by the Attorney General's Office, and the Court of Criminal Appeals simply copied sections of that opinion into its own. But be that as it may, the resolution of matters of fact was clearly erroneous because the court held that a 36-minute telephone exchange with two people was satisfactory investigation, which as a matter of fact and as a matter of law is not. And with respect to cases of the Supreme Court that governs starting from Strickland, going through Williams and Wiggins and Rompilla and Andrus, all of them demonstrate that the effort that was put into the investigation and the presentation was inadequate. This is the only case that our team has been able to locate in which there was absolutely not a single witness, where the entire mitigation case involved 21 words spoken by defense counsel right after the judge said to the jury it is open to the defense to put on anything they want on mitigation. They can say anything. It's almost unlimited, he said, at which point defense counsel stood up, said 19 words, handed over the birth certificate showing that his client was 18 and said the defense rests and sat down. That was the entirety of the case. He didn't say this man is particularly vulnerable because he was abused and he's still at age 18 living his childhood. He didn't say that. He simply said he is 18. So what did the jury know about him? The jury knew he was black. The jury knew he was male. The jury knew he was 18. That's all. And that is not sufficient under Supreme Court precedent, under the precedence of this court, or as a matter of simple logic. If I can go back to the prior conviction, and I'm asking you this because I'm sure that the state's going to bring it up on rebuttal. Well, the state dismissed this claim based on a procedural bar, right? Yes. And so how do you get around the state's procedural bar? Well, the state's procedural point itself, we argue, is inconsistent with Supreme Court precedent. Wiggins teaches that when counsel has an obligation to present mitigating evidence, that includes, that subsumes, that, to use the Supreme Court's word, comprises. Well, they said it was not that the claim was insufficiently clad. That's the argument. The author of the Rule 32 petition did not use the word aggravator. She used the word mitigator. And we argue that that is sufficient to put the court on notice and the state on notice that in this case, Tony Barksdale intended to put on evidence an argument of ineffective assistance with respect to both. So if I may reserve the rest of my time for rebuttal. Thank you, Your Honor. All right. Thank you, Mr. Schneebaum. Mr. Overing? May it please the Court. Robert Overing for the State of Alabama. This court can grant relief only if it concludes that every fair-minded jurist would agree that every reasonable counsel would have acted differently than Defense Counsel Goggins did here. And that the decisions he made— That a reasonable counsel, not every reasonable counsel. Your Honor, that's a quotation from the Supreme Court's decision in Dunn v. Reeves at page 2411 in 2001. I realize it wasn't in our brief, but it's a slightly different phrasing of the standard. Every reasonable lawyer would have made a different decision. All right. So let's talk about that. Let's start with the prior conviction. I know you've got a lot of arguments, so I'm just taking them one at a time. So let's talk about the prior conviction. It was deficient performance, was it not, to not investigate further the details of that armed robbery? I disagree, Your Honor. Goggins testified that he had spoken to Barksdale about the robbery. We don't know the content of that conversation, but the absence of evidence is not a reason to find deficiency. He spoke to his client, and there's evidence that he did look at at least some records because he referenced them in the penalty phase in his closing argument. What records were they? Well, we don't know which document, but he quoted that whatever he was looking at about the Virginia conviction said subjects' parents not present or not present in the courtroom. And he made reference to that in the closing argument. That has nothing to do with the prior conviction. I'm asking about the prior conviction. No, Your Honor, it was both. In his closing argument, he said, Barksdale's the only one here, I'm the only one here for him. Just like in Virginia, subjects' parents were not present. No, no, no. That has nothing to do with the existence of the conviction and his role in it. It may have explained why he got into the trouble he did in Virginia, but it says nothing at all, I think, about Mr. Barksdale's role. Let's put EDPA aside for just one second, okay? A person's reaction to an armed robbery conviction I submit to you is going to be different depending on whether or not the defendant was the person wielding the gun and putting the gun to the delivery driver's head or was the person working as a lookout in the car outside. Do you agree or disagree with that? EDPA aside. I agree that the fact that it's different to someone's reaction. Sure. And so whether or not at the end of the day you choose to try to put on that evidence or not, isn't it the obligation of a competent capital defense lawyer to investigate the circumstances of that offense when he knows that the state is putting it up as an aggravator? I'm suggesting that he did that reasonable investigation. There's no evidence that he got the pre-sentence investigation report, right? He could have done a different investigation. He could have done more. He could always have done more. But what he did was— He didn't do anything. He spoke to his client, and he must have reviewed some records. Well, why do you say that? Because in his closing argument, he was quoting from the Virginia case. He must have looked at some records. What did he quote from the Virginia case? That was when he said subjects parents not present in the courtroom. That has nothing to do with the fact of the crime. It has to do with whether or not he was, quote-unquote, abandoned by parents and left to his own devices. But it says nothing about the circumstances of the offense. There's no evidence that he reviewed the pre-sentence investigation report. There's no evidence that he reviewed the social services report. There's no evidence that he spoke to Mr. Barksdale's prior counsel. There's no evidence that he tried to reach out to the victim or even investigate the victim before he saw him for the first time in the courtroom at trial. I mean, that's really bad. It may not be bad enough to overcome AEDPA, but, I mean, that's just deficient performance. The Supreme Court has told us that if you know the state is going after an aggravator, you need to move heaven and earth to find out if there's anything you can do to mitigate that aggravator, and that wasn't done here. I understand some of the arguments about the mother and the father being uncooperative and all of that, but with regards to the aggravator, I just can't see how the performance side can be sanctioned. Your Honor, I think the record is pretty slim on what Goggins actually did with respect to the Virginia conviction. So we don't know whether he did or didn't look at files, and he didn't say, I didn't look up the files and I didn't get anything. He essentially said, I couldn't find them, and the absence of evidence does not make for a strickling claim. I think the easiest way for this Court to dispose of that, aside from the AEDPA standard, is on the prejudice prong, and the district court in this case had pretty good analysis on what would have happened if he had done more, if Goggins had done more on the prior conviction. This is a textbook case of a double-edged sword, because the prosecution had the victim of that witness waiting in the courtroom ready to testify, and Goggins made what the state courts called a wise decision not to have that witness testify when he could have said, thank goodness Barksdale wasn't the one holding the gun or I wouldn't be here today. He was 12 years old at the time? I believe he was older than that. I'm not sure. 16? I think he was 16. 16. I think that's right. This would have been devastating for Barksdale, and perhaps aggravating to his case, because the prosecution could have said, look how scary it is to be in Julie Rhodes' position, to be staring down the barrel of a gun, and that time, thankfully, it wasn't Barksdale, but this time it was. And the prosecution could have said, maybe Mr. Barksdale learned his lesson, and that when Cervantes testified against him, he learned not to leave witnesses alive, and that's what he did in this crime. That would have been devastating. That would have been extremely aggravating evidence, and it's the type of decision that a reasonably experienced counsel is well within his professional judgments to make. It's the type of decision that is not prejudicial, because we can't say to a reasonable probability that if the victim of the prior robbery were up on the stand, that the jury would have seen things differently for Barksdale. We should keep in mind, too, that the state had three statutory aggravators, not just the prior conviction of a crime of violence, which robbery is, but also the fact that this was a capital murder during a robbery, which is undisputed, and also that it was particularly heinous, atrocious, and cruel. And there's no contest in this appeal that it was, and multiple courts have said that there is overwhelming evidence that it was in this case, based on Barksdale's apparent pitiless reaction to committing this crime by pushing Julie Rhodes out of the car, driving off, bragging about the car, and flashing the murder weapon around like nothing had happened. And the prolonged suffering of Julie Rhodes went to the heinous, atrocious, and cruel nature of the crime as well. In the face of all of that, would it have made much of a difference for the jury to hear that in an earlier robbery, he wasn't the one holding the gun, his brother was? Not if you're not – I mean, you say it as an abstract, but the closing argument didn't do anything else. I mean, it's one thing to say, I'm not going to go down this road because it's the proverbial double-edged sword and it might hurt more than it helps, as long as you have some reasonable mitigation strategy in closing argument. But there was nothing here. I haven't found a single case that looks like this one. Is there a case that comes close to this where a federal court under AEDPA has said, no relief? In some cases, there are not many facts to redeem a defendant who did something so atrocious. Understood. But a lawyer always does something. What's the closest case to this case? So – Where a federal court has denied relief under AEDPA. I couldn't find one that was very close. I'm not sure that we cited one in our brief that fits exactly the facts of this case. Close. Under Strickland. Close. It's shocking case by case. I know, but courts reason by analogy and they look for markers in the AEDPA universe to see what has been deemed to be within reasonable competence, not contrary to non-reasonable application of, and I can't find anything close to this case. Well, Your Honor, that question cuts both ways because Goggins didn't present much mitigation, but neither did post-conviction counsel. They put two witnesses on at the hearing. If there were loads, vast tranches of mitigation evidence, then reasonably competent counsel would have found it in the years subsequent to the conviction. And it's not in the record here. Did he use an investigator to go out and try to interview the mother and father or go to school records or social records or anything else? What do his time records and billing records show that he did in terms of investigation? Well, he spoke to his client and he spoke to his client's parents, but there's no evidence in this case that there were school records that were readily available. Of course they're available. In this day and age, that's a different story that goes to prejudice. But I'm talking about performance. If your case is so bleak, right, because of the double-edged sword and the other problems, how in the world are you not busting down the door of the school district to get the records about his time growing up and how he did in school? If he did great in school, then you know that that's a dead-end road and you really can't use it. But if you have nothing else, how can you not be doing more on the performance side, on the investigation side? That's what I just can't wrap my head around. Well, I think it goes to a reasonable investigation as well, not just the prejudice prong. Whether Barksdale's post-conviction counsel is able to show these records were here and readily available and should have been entered into evidence. It's not enough to say he had a troubled upbringing to make for a Strickland claim. They've got to point to records that didn't come in but should have come in. They've got to point to witnesses who didn't testify but should have testified. They need to show specific facts, and the petition, the Rule 32 petition, didn't allege with great specificity what those facts were. And then at the hearing, there was very minimal testimony. So when you say, should he have looked for records? Any counsel should look for records. That is reasonable. I agree. But what happened in this case was that Goggin spoke to his client, spoke to the parents, and determined, based on his experience trying 20 to 25 capital cases, being the president of the Alabama Criminal Defense Lawyers Association, being someone who's taught CLEs on capital litigation, that these were roads not worth pursuing. He didn't find anything that would help him. Neither of the parents would have made good witnesses. The mother essentially said, Tony did it. She said, he got himself into this trouble. He needs to get himself out of it. That's not the type of witness you want to put on the stand. She couldn't remember basic facts about Tony's childhood, for example, when she and her husband got divorced. How old was Tony when that happened? How many times? She testified that she didn't know if her drug use was known to Tony, and we don't know whether Tony knew or remembered any of that abuse. She wouldn't have made a credible witness. And they haven't offered that the father would have been a much better witness because the father would have been doubtless a testimony. She would have revealed that Tony was involved in gangs and trafficking drugs, and he said to Mr. Goggins that Tony has a pattern of lying when he gets into trouble. That would not have helped before a jury that just heard for a week, Tony did it on accident. It was a complete accident. After hearing that week of lies, hearing the father come up and say Tony has a pattern of lying would have been devastating in the penalty phase. So if it's not the mother, and I think I just heard counsel say maybe it wouldn't have been reasonable to bring the mother on the stand, and it's not the father, we don't know what he would have said because he didn't testify in post-conviction proceedings, then who? Well, that is Max Johnson, who was a basketball coach for Tony in middle school. He couldn't have testified to the abuse. He only knew about the abuse secondhand from his own son, who was 12 years old, and said I don't know details, it's a hearsay. There is no corroboration. And I don't know, but I thought I read in the record that he had sporadic contact with him after a certain age, Johnson. That's right, Your Honor. He had some contact. I believe Wall Barksdale was in prison in Virginia. But then lost contact and didn't know, heard secondhand about the murder trial, wasn't talking to Barksdale regularly, and didn't know that perhaps he could have talked. And they haven't shown that he would have been available and willing to testify at the time. He was in the military and traveling and hadn't testified. What would he have said? And I think this goes to both prongs, because if we don't know what that testimony would have been, then it's hard to say that it was unreasonable to investigate and learn that testimony. That can't be right. You're using the lack of prejudice to show appropriate performance. You can't use that loop. The question is whether he should have investigated. Now, if there's no evidence about, so for example, think of a case where there is an alleged crime and the lawyer doesn't investigate anything about the alleged crime. Nothing at all. Client gets convicted. That would be deficient performance. But if the evidentiary hearing later on shows that the evidence would have been overwhelming about conviction, you can't show prejudice. But it still doesn't take away from the deficient performance. I hear you on that hypothetical, Your Honor. But the Supreme Court in multiple cases talking about performance has referred to voluminous evidence, vast amounts of evidence. I think in one case in this court, there were 40 to 45 witnesses that the investigator spoke to, and then counsel didn't use that. And that went to performance because it was right there. It was so readily available. And so there has to be some specific description of what that record was, what that witness would have said for us to know if it was unreasonable. I think it's not as—they're not sealed. They're not two separate inquiries. I think they blend into each other a little bit when the Supreme Court is talking about how available and easily accessible the evidence was. We do have some authority out there where we say that before you can arrive at a strategic decision with regard to, you know, this mitigation evidence, you have to conduct a reasonable investigation first. That's right. And so that's his primary claim, that he was not able to arrive at that decision to determine the risks associated with putting the mother on the stand and the father on the stand without first having conducted that investigation. That's right. The investigation must be reasonable, and the presentation must be reasonable. Goggins faced resistance from the mother, and he saw that there wasn't—he wasn't going to have much help, that she was hard to pin down, hard to get a hold of. When he called her, she wouldn't return his calls. And under Strickland, he's got to show specific acts or omissions, what counsel should have done differently. And I haven't heard what counsel should have done that would have led to learning this evidence about drug abuse from the mother and the abuse of the father to the mother and how he would have put that into evidence. And so with an absence of a record, the Supreme Court said in Reeves, is not—doesn't go to the petitioner's favor, but is a reason to deny the claim. I think counsel mentioned what Goggins actually did and said that he focused only on age in the penalty phase and nothing more. But that's not quite right, and it's misleading to characterize this mitigation case as just 19 words when he had a whole closing statement where he referenced age. But he also said that life without parole is a harsh penalty on its own, encouraging the jury to accept that that was a proportionate and fair sentence in this case. He also made biblical arguments for compassion, and he also noted that the subject's parents weren't present. He said, I'm the only thing here standing between Barksdale and the death penalty as an advocate of the law. And so he had arguments, but the fact that there wasn't more mitigation presented isn't to Goggins' discredit. It's simply there wasn't much out there to find and that could be presented and put into evidence. And the post-conviction history in this case shows that, where now they've said maybe the mother wouldn't have made a good witness, maybe even the father they haven't said would be a good witness. So who else is out there to testify to these mitigating circumstances and to the abuse that happened when Barksdale was a very small child? Barksdale himself may not have remembered it. A lot of this is corroborated by the pre-sentence report in this case where Barksdale reported no medical problems, no significant mental health issues that required treatment, and he said he had a good relationship with his family and could recall no significant adverse events in his childhood that affected him through adolescence. So it wasn't just Goggins' investigation, but also that of the probation officer in the sentence report. If Barksdale isn't bringing any of this to his lawyer, the parents are non-cooperative or actually provide bad evidence, then in terms of performance, what specific actions should Goggins have taken in order to get additional record and witness testimony for the mitigation phase? Is the pre-sentence investigation report an exhibit that was introduced at the evidentiary hearing or it just exists from the original criminal proceeding? Or both? If it wasn't, do you think it's part of the record in the underlying criminal case that's available to us? Not that it wasn't given to the parties, of course, but that it's available for review? I believe it was quoted in the state for Rule 32 decisions, so they must have had it in front of them. Right, so I'm asking whether there's a piece of paper, pieces of paper in the record somewhere that we can find the pre-sentence investigation report or just snippets of it alluded to by different people. The record on appeal doesn't contain it in full, is my understanding. Just snippets in the record on appeal, whether it's in the record below, we could look into that and see if we could take it up, but I'm not aware. I haven't seen the full pre-sentence report, but we have quotations from it which corroborate much of what Goggins testified to in the Rule 32 evidentiary hearing. Who else could have testified? It probably wouldn't have been Mark Sales' acquaintances. Many of his friends who were scared of him holding the gun and pointing at them. At one point, a pregnant woman told him, please don't point that gun, and Mark Sales apparently had a lot of fun showing off his gun and his new car, and he even threatened one of the friends to hide the murder weapon when he realized perhaps that the police would be coming after him. None of these people would have made compelling witnesses. They could have just provided further color as to the erratic nature and lack of remorse that Barksdale demonstrated after the crime. Whether... I think the easiest way for the court to resolve this case is on the prejudice prong, and the evidence in mitigation is so scant that a jury having sat through seven days with something like 70 witnesses would have changed its mind upon hearing stories about how his mother abused drugs. There's no connection to the crime. This is not a case where you have, for example, a defendant who was sexually abused as a child and then goes out and commits a crime of a sexual nature, and you should have a psychologist or a psychiatrist testify that there's some kind of connection between the crime done to the child and the crime committed today. We don't have that here. They haven't shown how it would diminish Barksdale's culpability to learn that his mother had been using drugs when he was a child, how that relates to the fact that he shot an innocent teenage girl in the face and in the back. And it's the Strickland claimant's, the petitioner's, burden to show that the jury would have thought this diminished his culpability, not just that something bad happened to him in childhood, but that it did something to lessen this particular crime at this particular time. And there's simply no relationship there. The best that counsel had to offer was age. Now, Barksdale says that the jury needed to hear additional evidence of his background. I submit that the jury had heard enough. They had heard about how Barksdale put a loaded gun to Julie Rode's head, and she begged for her life. Please, don't shoot me. And Barksdale responded by calling her a bitch and shooting her in the face and in the back, and then pushing her out of her car, driving off and leaving her to bleed to death over the course of four hours. They heard about how he went home and flashed his gun around, and then when the police asked him about the murder, he sat in his car in the back of them. This was a heinous, atrocious, and cruel crime. And sometimes there's simply not much you can say on behalf of a defendant who commits such an act. That act in Alabama has a penalty, and the penalty is death. This court should defer if there are no further questions. All right. Thank you, Mr. Overin. And Mr. Schneebaum, you have reserved some time for rebuttal. I have, Your Honors, and thank you. Tell me why we can't say that the prior conviction claim is procedurally barred. Prior conviction claim is not procedurally barred because the precise evidence that the Court of Criminal Appeals did not address it. And when it simply gave the back of its hand to it, saying... I thought the Court of Criminal Appeals said it was insufficiently pled. Yes, the claim... I respectfully submit there may be two aspects to this particular point. One is whether it was sufficiently pled, and we argue that it was, because, as I argued earlier, Wiggins teaches, and other cases, including ones of this court, teach that the obligation to develop mitigating evidence includes the obligation to attack aggravators. But apparently, the Court of Criminal Appeals' decision centered on the fact that, simply, we did not use the word aggravators. We did not focus on aggravators. And, again, we submit that Wiggins answers that, and that holding is inconsistent with teachings of the Supreme Court. Now, to address what the Counsel for the State just said, I was very interested to hear that he focused so much on the closing argument that Mr. Goggins gave, and he said, correctly, that Goggins said in the closing argument that Barksdale's parents aren't here in the courtroom. I'm the only one with him. And that was absolutely true. But here's the thing. The jury didn't have any idea whether he had parents. He didn't know whether the parents were alive or dead, whether they were off on vacation somewhere, or whether they were serving time in prison. They knew nothing about the parents. But one of Mr. Overing's arguments is that it would have been very hard, if not impossible, for the trial attorney to present the evidence you now say is mitigating because of the lack of viable witnesses. Well, let me address that, Your Honor, because it seems to be generally assumed that Mary Archie would have been a bad witness. I don't think she would have been a bad witness at all. I think she would have been a very powerful witness. But didn't the lawyer have different views on that? He did, after a total of 18 minutes of conversation with her, six of which were about clothing, in which she didn't open up to him. Well, imagine that. She gets a phone call. She's in Virginia. She gets a phone call from some lawyer in Alabama, and in 12 minutes she's supposed to confess that she was the victim of an attempted rape, and that she was a drug addict, and that she was a bad mother. It takes some work to develop evidence in mitigation, especially when you have a disturbed family. And again, Ron Pilla teaches that. The mere fact that witnesses, potential witnesses, especially family members who are likely to have the deepest emotional investment in the case, are resisting at first, simply means you have to work harder. You can't give up at that point. You can't just say, oh, this lady didn't want to talk to me, therefore she's useless as a witness. What about asking her questions? He didn't ask about violence. He didn't ask about drugs. She specifically testified to that. And he couldn't testify at all, after Rule 32, about what he did discuss with her, because he didn't remember. So the bottom line is this, we submit, that this court has numerous times answered the question that I think your honors were asking my friend. This court said in Johnson, the Secretary of Department of Corrections, it is unreasonable to discount to irrelevance the evidence of a defendant's abusive childhood. And in Cooper, in that same year, 2011, the court said, background and character evidence is relevant because of the belief long held by this society that defendants who commit criminal acts that are attributable to a disadvantaged background may be less culpable than defendants who have no such excuse. The kind of crime doesn't need to relate to the kind of abuse. Tony Barksdale was 18 years and 7 months old. The age issue, the age mitigator, should have been, but was not, presented in the context of the abuse that he suffered. Unlike, for example, Pye, in the case that this court heard on Bank, where he was well into his 20s, and the argument surrounded whether an older person can still plead that child abuse drove him to crime, this man was 7 months past his 18th birthday. Very much still a juvenile in the dictionary definition of that term. And the jury knew nothing about what he had undergone. That, again, is the bottom line. The individualized presentation about Tony Barksdale was never made to his sentencing jury. So with that, if there are no further questions, I thank the court for its attention. All right, thank you. We have your argument. The case was well argued. Thank you. And court is adjourned for the day. All rise. Thank you.